## BEHANEY et al. v. TRAVELERS INS. CO.

### No. 7625.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

John C. Stockel, of Perth Amboy, N. J., for appellant.

William Reich, of Trenton, N. J. (Arthur Reich and Alexander Eber, both of New Brunswick, N. J., on the brief), for appellees.

Before MARIS, CLARK, and JONES, Circuit Judges.

CLARK, Circuit Judge.

The question now before us on appeal arose at the end of the trial below. For that reason probably the argument thereon does not seem to have been addressed squarely to what we believe to be the issue. Possibly this oblique start affected the later presentation because we find in the briefs and argument here somewhat the same emphasis. The parties agree as to the facts. The plaintiff is the widow of a man who was run over and killed by the milk delivery truck of the defendant's assured. The accident happened in Atlantic City when the truck was being driven "past" its terminal garage to the house of its driver.[1] The driver testified that he "was supposed to take it (the truck) to the garage".[2] Instead of doing so, he went on in order to ask his wife to come for him after he had serviced his truck at the garage and so save him an eighteen block walk. The driver's employer, a dairy company, carried what might be called the usual automobile accident policy[3] issued by the defendant company. These policies contain a clause conforming them to the local motor vehicle responsibility law.[4] This clause reads: "Any insurance provided by this policy for bodily injury liability or property damage liability shall conform to the provisions of the motor vehicle financial responsibility law of any state or province which shall be applicable with respect to any such liability

---

[1] Appendix to appellant's brief, p. 69.
[2] Appendix to appellant's brief, p. 67.
[3] Exhibit P. 1.
[4] N.J.S.A. 39:6-1.

arising from the use of the automobile during the policy period, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy * * *." Exhibit P 1, Section 13.

The provisions of the policy attempting to define or delimit its coverage are in this language:

"The unqualified word 'insured' wherever used in Coverages A and B and in other parts of this policy, when applicable to these coverages, includes not only the named insured but also any person while using the automobile and any person or organization legally responsible for the use thereof, provided that the declared and actual use of the automobile is 'pleasure and business' or 'commercial', each as defined herein, and provided further that the actual use is with the permission of the named insured. * * *" Exhibit P 1, Paragraph 3.

"(a) The term 'pleasure and business' is defined as personal, pleasure, family and business use. (b) The term 'commercial' is defined as the transportation or delivery of goods, merchandise or other materials, and uses incidental thereto, in direct connection with the named insured's business occupation as expressed in Item 1. (c) Use of the automobile for the purposes stated includes the loading and unloading thereof." Exhibit P 1, Section 2.

The advent of the automobile added fresh fuel to the flames of the conflict between the at fault and at peril schools of tort philosophy. At first the "devil wagon"[5] joined the horse and buggy in the negligence fold.[6] Soon its greater resemblance to a reservoir, a forest fire, or a wild animal[7] became apparent at least to the laity. We say at least to the laity because the practicing profession clung to the tradition. The more advanced thinkers outside thereof were quite willing to recognize reality and declare for absolute liability.[8] A slightly less enterprising group balked at absolute liability but insisted upon absolute insurance.[9] Bringing up the rear of those who felt "something should be done about sudden death on the highway" were the proponents of the safety responsibility laws.[10] They adhered to fault but agreed

---

[5] Christy v. Elliott, 216 Ill. 31, 74 N. E. 1035, 1 L.R.A.,N.S., 215, 225, 108 Am. St.Rep. 196, 3 Ann.Cas. 487; 59 Century Law Journal 432.

[6] Nixon, Changing Rules of Liability in Automobile Accident Litigation, 3 Law and Contemporary Problems 476, 477.

[7] 3 Restatement of the Law of Torts, Division 3, Absolute Liability, Chapter 20, Liability of Possessors and Harborers of Animals, Chapter 21, Ultrahazardous Activities Other Than the Keeping of Wild Animals or Abnormally Dangerous Domestic Animals; Thayer, Liability Without Fault, 29 Harvard Law Review 801.

[8] Ballantine, A Compensation Plan for Railway Accident Claims, 29 Harvard Law Review 705; Rollins, A Proposal to Extend the Compensation Principle to Accidents in the Streets, 4 Massachusetts Law Quarterly 392; Carman, Is a Motor Vehicle Accident Compensation Act Advisable, 4 Minnesota Law Review 1; Chaplin, Compensation for Street Accidents, 54 Survey 526; Marx, Compulsory Automobile Insurance, 11 American Bar Association Journal 731; Marx, Compulsory Automobile Insurance, 1 University of Cincinnati Law Review 445; Compensation for Motor Accidents, 52 New Republic 112; Marx, Compulsory Compensation Insurance, 25 Columbia Law Review 164; Elsbree and Roberts, Compulsory Insurance Against Motor Vehicle Accidents, 76 University of Pennsylvania Law Review 690; Loman, Compulsory Automobile Insurance, 130 Annals 163; Smith, Lilly, Dowling, Compensation for Automobile Accidents: A Symposium, 32 Columbia Law Review 785, 803, 813; Bromley, After the Automobile Accident, 164 Harper's 477; Hall, Plan Providing Sure Compensation for Persons Injured in Automobile Accidents, 7 California State Bar Journal 38; Andrews, Providing Compensation for Persons Injured in Automobile Accidents, 7 California State Bar Journal 112; Sweet, Proposed Commission Plan for Handling Controversies Arising Out of Automobile Accidents, 7 California State Bar Journal 142; Ballantine, Compensation for Automobile Accidents, 18 American Bar Association Journal 221.

[9] Report of the Special Commission to Study Compulsory Motor Vehicle Liability Insurance and Related Matters, Mass. Senate No. 280, printed in 15 Massachusetts Law Quarterly No. 3; Blanchard, Compulsory Motor Vehicle Liability Insurance in Massachusetts, 3 Law and Contemporary Problems 537; Legislative and Judicial Assistance to Automobile Accident Victims—Compulsory Insurance, Financial Responsibility Laws and Automobile Accident Compensation, 16 New York University Law Quarterly 126 (note).

[10] Braun, The Financial Responsibility Law, 3 Law and Contemporary Problems 505.

that fault should be paid for. So the likelihood of its occurrence was made the test of the latter's guaranty. As one might expect, this middle of the road appealed to the majority of the states—all, in fact, except Massachusetts. [11]

In its drafting, this type of legislation evinces an approach that endangers even its limited purpose. The argument in this very case centers around the gap so created. The Uniform Law Commissioners, more expert and possibly more unselfish than the automobile and insurance associations, submitted an act written around the operation rather than the ownership of the automobile. [12] Up to 1940 this act had been adopted only in Pennsylvania. [13] In their prefatory note the Commissioners summarize the advantages of their form of Act saying:

"The draft here presented seeks to eliminate irresponsible operators largely through control of operators' licenses and by requiring operators to carry insurance covering any accident in which they may be involved while driving any automobile. This, in our judgment, will be much more effective than a requirement that under certain circumstances the owner of automobiles must carry insurance covering the motor vehicles owned by him. This later type of insurance is of no avail when an operator is driving for his own purposes a car not owned by him. On the other hand a policy covering the operator, regardless of the ownership of the car which he is operating, provides full protection, within the limits of the policy, in the event of any accident occurring while the insured is at the wheel. * * *

"Likewise, if it is proper, as we believe it is, to require an operator to carry insurance, if he has had, in any year, more than two accidents involving substantial damages, it does not meet the situation to require him to insure only such cars as he owns. Adequate protection can be obtained only by requiring him to be insured against liability arising out of his operation of a motor vehicle no matter whose motor vehicle it may be." 11 Uniform Laws Annotated p. 127.

■ The defense in the case at bar, as the facts themselves suggest, is the ancient "frolic of his own". In the respondeat superior doctrine of agency, we have the same wavering and the same cleavage we observed in the law of torts. The theory that he who starts the machinery should foot the bill for whatever happens is qualified by some idea of control over the human element. So we struggle with the endless refinements of the scope of his master's business and a way, even if a poor way, of accomplishing the same. These refinements have been criticized: "In view of the suggested justification for respondeat superior, it may be argued that it is a matter of common knowledge that servants employed to drive automobiles frequently do make short excursions on errands of their own which they would not have made but for the fact that they had been sent on an errand for the master. Such conduct on the part of servants must, therefore, be regarded as a probable result of employing servants to drive automobiles: just as probable as that they will drive at a reckless speed. Accordingly the undertaking of an enterprise involving the employment of chauffers must necessarily expose third parties to a risk of injury from such excursions as well as expressly authorized acts and should therefore, be borne by the enterprise which caused the risk. Had the courts taken this view of the problem, many of the subtle distinctions between 'frolics' and 'detours' would not exist." Smith, Frolic and Detour, 23 Columbia Law Review 444, 716, 718 and 724. [14]

They still prevail in New Jersey, however, and appellant's counsel is correct in his contention that the facts of the principal case place the driver's conduct clearly outside the scope of his employment at the time of the accident. The cases are collected and annotated in Owners Liability for Injury by Automobile While Being Used By a Servant for His Own Pleasure Or Business, 22 A.L.R. 1397; 45 A.L.R. 477; 68 A.L.R. 1051; 80 A.L.R. 725; 122 A.L.R. 858.

■ If there had been no financial responsibility law and no insurance there

---

[11] Braun, The Financial Responsibility Law, above cited; Automobiles—Financial Responsibility Laws Classified, 12 Wisconsin Law Review 96.

[12] 11 Uniform Laws Annotated p. 125.

[13] 75 P.S.Pa. § 1253.

[14] Cf. Douglas, Vicarious Liability and Administration of Risk, 38 Yale Law Journal 584; Agency—Scope of Employment, 6 Wisconsin Law Review 239 (note); Master and Servant—Frolic and Detour, 2 Missouri Law Review 351 (Note); Laski, The Basis of Vicarious Liability, 26 Yale Law Journal 105, 121–122.

could have been no recovery. As it is, we believe the learned district judge is correct in his conclusion to the contrary. The question is one of statutory construction. We are not, as we think, assisted by most of the New Jersey cases relied on. They hold that a breach of warranty by the assured is of no avail under the New Jersey Act.[15] That holding is based upon the word "absolute" in Section 10 of the Act.[16] The courts say that this abrogates the ordinary rule of defenses in a derivative action. The decisions have been criticized[17] and defended.[18] We quite agree with counsel for the appellant that these cases are not controlling. At most they foreshadow a policy. The assured's promise is relevant to the victim's claim because the action is derivative. The use of "absolute" in Section 10 changes that. It has no effect on an exception or restriction in the insurer's liability.

We must look elsewhere then for any alteration in the ordinary principles of the law of master and servant. A writer, Shippen Lewis, poses the problem thus: "* * * How the victim will fare if the car was driven by a son of the owner who borrows it without his father's permission, or by a servant of the owner who extends a business trip to a joy ride, will depend on whether the compensation law makes any change in the pre-existing law as to liability because of agency or consent. Such a change is a matter really apart from the compensation principle, though the adoption of that principle will focus attention on the questions of agency and of consent. Certainly there is a strong argument in favor of imposing liability, whether with or without fault, for the acts of a son or of a servant who habitually uses the owner's car, for the victim of an accident in such cases is almost helpless in the face of any evidence which the defendant or his carrier may offer as to agency or consent." Lewis, The Merits of the Automobile Compensation Plan, 3 Law and Contemporary Problems 583, 593.

That elsewhere here is found in a term prescribed for the "required" policy by the Act. The Act and so the policy say: "* * * insure the insured named therein and any other person using or responsible for the use of any such motor vehicle with the express or implied consent of the insured, against loss * * *." N.J.S.A. 39:6–18.

"* * * and provided further that the actual use is with the permission of the named insured. * * *" Exhibit P 1, Paragraph 3.

Taken at their face value these words would seem to end the matter. They have not always been so taken. In fact, there is a split in the authorities. As has been said, one group follows the lead of Dickinson v. Maryland Casualty Co.,[19] a case holding that a considerable deviation by the permittee from the authorized act is within the permission granted even to the point of regarding as "permitted" a completely new act starting after completion of the authorized act. On the other hand, in Denny v. Royal Indemnity Co.,[20] and the cases agreeing with it, the limits of permission under the omnibus clause are considered co-extensive with the deviations allowed under the theory of respondeat superior. Fortunately, for our own sense of fairness, New Jersey expressly and by citation[21] follows the view expressed in the Dickinson case. The insurance carriers have not been satisfied to rely on a judicial willingness to restrict the statutory phrase but have attempted some express exclusions of their own. Of these, the ones of the policy of the principal case are fairly typical. The jurisprudence of New Jersey includes no ruling on the point. We join with a writer in feeling: "* * * The potency of expressed exclusions is best illustrated by those cases where the policy contained a condition limiting the use of the vehicle to the business of the named assured. The holdings giving full effect to this condition by denying the benefit of the insurance where the permittee used the car for his

---

[15] United States Casualty Co. v. Timmerman, 118 N.J.Eq. 563, 180 A. 629; Woloshin v. Century Indemnity Co., 116 N.J.L. 577, 186 A. 44; Ambrose v. Indemnity Insurance Co. of North America, 120 N.J.L. 248, 199 A. 47.

[16] N.J.S.A. 39:6–20(a).

[17] Burton and Seidman, Absolute Liability of Companies Under the Financial Responsibility Act, 62 New Jersey Law Journal 333.

[18] Laird, Another Construction of the Financial Responsibility Act, 62 New Jersey Law Journal 377.

[19] 101 Conn. 369, 125 A. 866, 41 L.R.A. 500.

[20] 26 Ohio App. 566, 159 N.E. 107.

[21] Rikowski v. Fidelity & Casualty Co., 117 N.J.L. 407, 189 A. 102, 104.

842

own purpose are unfortunate. The omnibus clause is thus made inoperative except insofar as it extends coverage to the tortfeasor if the injured plaintiff chooses to sue him instead of imposing vicarious liability on the named assured." The Legal Position of the Omnibus Defendant, 83 University of Pennsylvania Law Review 765, 770 (note).

As he points out, this emasculation of the omnibus coverage is so far contrary to a general legislative policy that many states have proscribed it in haec verba.[22] Although possibly useful in avoiding litigation we do not believe the express statutory prohibition to be necessary. The consent of the statute is broad enough to override the condition of the policy.[23]

■ The judgment of the trial court in favor of the plaintiff Anna Behaney, Administratrix ad prosequendum of the Estate of James J. Behaney, deceased, should have been limited to $5,000 exclusive of costs and interest since this is the limitation imposed by the Financial Responsibility Act.[24] The point was raised below, exception properly taken,[25] and, we gathered, not very zealously contested here.

Although approving the principle of the decision, we must reverse because of a failure to place a limitation on the extent of the defendant's liability. The judgment is therefore reversed and the cause remanded for further proceedings in accordance with this opinion.

---

[22] Insurance — Automobiles — "Omnibus Coverage" Statute, 8 Wisconsin Law Review 349 (note).

[23] Georgia Casualty Co. v. Waldman, 5 Cir., 53 F.2d 24.

[24] Ambrose v. Indemnity Insurance Co. of North America, 124 N.J.L. 438, 12 A. 2d 693.

[25] Appendix to appellant's brief, p. 109.